**In the MATTER OF the SEARCH WARRANT FOR [REDACTED].COM**

**No. 16–2316M (FFM)**

United States District Court, C.D. California.

Signed March 31, 2017

ORDER GRANTING IN PART ADOBE SYSTEMS INCORPORATED'S *EX PARTE* APPLICATION TO AMEND INDEFINITE NONDISCLOSURE ORDER ACCOMPANYING SEARCH WARRANT

FREDERICK F. MUMM, United States Magistrate Judge

## I. PROCEEDINGS AND BACKGROUND

On November 22, 2016, this Court issued under seal a search warrant (the "Warrant") pursuant to 18 U.S.C. § 2703 ("Section 2703") and Federal Rule of Criminal Procedure 41(c). The Warrant was directed to Adobe Systems Incorporated ("Adobe") and included a notice preclusion order (the "NPO"). The NPO precludes Adobe from notifying anyone, including the investigation's target (the "Subscriber"), of the Warrant's existence. The Warrant does not specify a duration for the NPO. Upon receipt of the Warrant, Adobe requested *via* correspondence that the agency in question seek an amendment of the Warrant to limit the NPO's duration. Counsel for the United States (the "government") declined to do so.

On December 6, 2016, Adobe filed an *ex parte* application (the "Application" or "Appl.") to amend the NPO to include a date certain for its expiration. Adobe provides evidence that it has a policy of notifying its subscribers whenever someone asks for their information, unless Adobe is legally prohibited from doing so. If Adobe receives a court order requiring that notice be delayed, Adobe delays notice for the period specified and then notifies the subscriber once the order expires.

Adobe provides evidence, in addition, that for each fiscal year, it publishes a "Government Requests Transparency Report." The report publicly discloses in-

formation regarding Adobe's receipt of government subpoenas, warrants, *etc.* for information pertaining to Adobe users and their data. Adobe discloses general information such as the number of information requests and NPOs received; the number of user accounts affected; and the Adobe services for which the requests sought information.

The government filed an opposition (the "Opposition" or "Oppo.") to the Application on January 12, 2017. Adobe filed a reply (the "Reply") on January 27, 2017 and submitted a supplemental reply (the "Suppl. Reply") on February 6, 2017. The matter came for hearing on February 8, 2017.

The matter thus stands submitted. For the reasons that follow, the Court grants the Application in part.

## II. ANALYSIS

### A. Section 2705(b) does not require a finite period for the NPO.

Adobe first contends that 18 U.S. § 2750(b) ("Section 2705(b)") requires that the Court provide a date certain for the NPO's expiration. The government contends that Section 2705(b) allows for NPOs of indefinite duration. The Court agrees with the government.

#### (1) Overview of the ECPA and the SCA.

The Electronic Communications Privacy Act of 1986 (the "ECPA"), 18 U.S.C. §§ 2510 *et seq.*, "was intended to afford privacy protection to electronic communications." *Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868, 874 (9th Cir. 2002). The ECPA regulates "various areas of electronic surveillance, including wiretaps, tracking devices, stored wire and electronic communications, pen registers, and trap and trace devices." *Microsoft Corp. v. United States Dep't of Justice*, 2016 WL 4506808, *1 (W.D. Wash. August 29, 2016) (internal quotation marks omitted); *see* 18 U.S.C. §§ 2510 *et seq.* Title II of the ECPA, 18 U.S.C. §§ 2701–2712, is commonly referred to as the Stored Communications Act (the "SCA"). The SCA "was designed to address[ ] access to stored wire and electronic communications and transactional records." *Konop*, 302 F.3d at 874 (internal quotation marks omitted).

In pertinent part, the SCA regulates the government's access to electronic communications and information stored by two types of service providers: (1) electronic communication service ("ECS") providers; and remote computing service ("RCS") providers. *See* 18 U.S.C. § 2703; *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1103 (9th Cir. 2014); *Warshak v. United States*, 532 F.3d 521, 523 (6th Cir. 2008). An ECS provider is an entity that offers "any service which provides to users ... the ability to send or receive wire or electronic communications"—*e.g.*, an email service provider. 18 U.S.C. § 2510(15); *see* 18 U.S.C. §§ 2510(12), 2711(1); *Warshak*, 532 F.3d at 523. An RCS provider is an entity that provides to the public "computer storage or processing services by means of an electronic communications system"—*e.g.*, a cloud computing services provider such as Adobe. 18 U.S.C. § 2711(2); *see* 18 U.S.C. §§ 2510(14), 2711(1); *Warshak*, 532 F.3d at 523. A "user" or "subscriber" is a person who uses those services. *See* 18 U.S.C. §§ 2510(13), 2703(b)-(c); *see also In re Application of the U.S. For An Order Pursuant To 18 U.S.C. 2705(b)*, 131 F.Supp.3d 1266, 1268 (D. Utah 2015) (discussing subscribers as those individuals who use electronic communications and remote computing services).

#### (2) Sections 2703 and 2705.

Within the SCA, Section 2703 regulates the government's acquisition of a subscriber's electronic communications, and certain

other records and information, from a service provider. 18 U.S.C. § 2703(a)-(c). Section 2703 provides for different means of obtaining the evidence, and different levels of privacy protection, depending on the type of evidence sought and the type of provider possessing it. *Id.*; *Warshak*, 532 F.3d at 523. As relevant to these proceedings, under Section 2703(b)(1), the government may obtain communications from an RCS provider *via* a warrant, administrative subpoena, grand jury subpoena, trial subpoena, or court order. 18 U.S.C. § 2703(b)(1)(A)–(B). If the government uses a subpoena or court order, it must provide prior notice of the subpoena or order to the subscriber, although such notice may be delayed. 18 U.S.C. § 2703(b)(1)(B); *see* discussion, *infra*. However, if the government secures a warrant for the communications, the government may obtain the communications "*without [providing the] required notice to the subscriber or customer.*" 18 U.S.C. § 2703(b)(1)(A) (emphasis added); *In re Application of the U.S.*, 131 F.Supp.3d at 1271.[1]

Section 2705, in turn, sets forth the circumstances in which the government may delay notifying a subscriber that his data has been searched, and/or preclude the service provider from doing the same. *See* 18 U.S.C. § 2705(a)-(b). As relevant, under Section 2705(a), if the government obtains evidence from an RCS provider *via* a subpoena or court order, the government may delay notifying the subscriber for up to 90 days upon demonstrating or certifying that notification "may" have a specified "ad-

verse result." 18 U.S.C. § 2705(a)(1)(A)–(B), (a)(2)(A)–(E). The 90–day period may be extended, but only in 90–day increments and only if the government demonstrates or certifies that notification "will" have a specified "adverse result." *See* 18 U.S.C. § 2705(a)(4), (b).

■ Section 2750(b) provides:

**(b) Preclusion of notice to subject of governmental access.**—A governmental entity acting under section 2703, *when it is not required to notify the subscriber or customer under section 2703(b)(1)*, or to the extent that it may delay such notice pursuant to subsection (a) of this section, *may apply to a court for an order commanding a provider of electronic communications service or remote computing service* to whom a warrant, subpoena, or court order is directed, *for such period as the* <u>court deems appropriate, not to notify</u> *any other person of the existence of the warrant, subpoena, or court order*. The court shall enter such an order if it determines that there is reason to believe that notification of the existence of the warrant, subpoena, or court order will result in—

(1) endangering the life or physical safety of an individual;

(2) flight from prosecution;

(3) destruction of or tampering with evidence;

(4) intimidation of potential witnesses; or

(5) otherwise seriously jeopardizing an investigation or unduly delaying a trial.[2]

---

**1.** Similarly, under Section 2703(c), if the government seeks certain non-communication records or personal information pertaining to a subscriber, the government "*is not required to provide notice to [the] subscriber or customer.*" 18 U.S.C. § 2703(c)(3) (emphasis added). This lack of a notice requirement applies whether the government obtains the records or information *via* warrant, court order, sub-

poena, or other specified means, and whether an ECS or RCS provider possesses the records or information. *See* 18 U.S.C. § 2703(c)(1)–(3).

**2.** The "adverse results" justifying a Section 2705(a) delayed notice order are the same factors justifying a Section 2705(b) NPO.

18 U.S.C. § 2705(b) (emphasis added). Thus, if the government obtains a warrant for a subscriber's communications pursuant to Section 2703(b)(1)(A)—and may thus proceed *"without required notice to the subscriber or customer"*—the government may obtain an NPO directed to the RCS provider *"for such period as the court deems appropriate." In re Application of the U.S.*, 131 F.Supp.3d at 1271–72 (emphasis added). The same is true of non-communication records and information obtained pursuant to Section 2703(c). *Id.* at 1274–76.

 Limiting the Section 2705(b) NPO.

 Section 2705(b) does not set forth an explicit limit—*e.g.*, 90 days—on the permissible duration of a Section 2705(b) NPO obtained in connection with a warrant under Section 2703(b)(1)(A) or 2703(c). Adobe nonetheless contends that the term "for such period as the court deems appropriate" means that the *court must specify a finite* notice preclusion period. (Appl. at 3.) If the court did *not* have to specify a finite period, Adobe contends, the "appropriate period" provision would be "mere surplusage," because the court could render an NPO indefinite simply by not specifying any time limit. (*Id.*) In Adobe's view, "an 'indeterminate' [NPO] has no time period at all." (Reply at 2.)

 Adobe is correct to the extent that "[i]t is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 928 (9th Cir. 2004) (internal quotation marks omitted; citing, *inter alia, TRW Inc. v. Andrews*, 534 U.S. 19, 31, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001)). However, the Court does not agree that Section 2705(b)'s "appropriate period"

provision would be rendered superfluous by reading the statute to allow for indefinite NPOs.

 "Our first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997). "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Id.* at 341, 117 S.Ct. 843. With respect to the language itself, "[courts] must give words their ordinary or natural meaning." *Leocal v. Ashcroft*, 543 U.S. 1, 9, 125 S.Ct. 377, 160 L.Ed.2d 271 (2004) (internal quotation marks omitted). Where a term is undefined in the statute, courts may follow "the common practice of consulting dictionary definitions to clarify their ordinary meaning and look to how the terms were defined at the time [the statute] was adopted." *United States v. TRW Rifle 7.62X51mm Caliber, One Model 14 Serial 593006*, 447 F.3d 686, 689 (9th Cir. 2006) (internal quotation marks and brackets omitted). Where multiple definitions are given, courts must decide which definition is consistent with the statute's context. *Id.* at 690.

Here, the language itself is simple: the NPO may last for the "period" deemed appropriate by the court. The SCA does not define the term "period." *See* 18 U.S.C. §§ 2701–2712. Accordingly, the Court may look to the dictionary definition of the term to clarify its meaning.

Of the multiple definitions for "period" as a chronological term, the most relevant are:

*Compare* 18 U.S.C. § 2705(a)(2)(A)–(E) *with* 18 U.S.C. § 2705(b)(2)–(6).

8 **a** : a chronological division (as of a life, a development) : STAGE < = of infancy > < = of preparation and training > < = of incubation of a disease > ... **c** : a time often of indefinite length but of distinctive or specified character : SPELL < = of laziness > < =*s* of anxiety > < a = of wet weather > < =*s* of rising prices >

Webster's Third New International Dictionary (Merriam–Webster Inc. 2002) (emphasis and brackets in original).[3] The latter definition is more consistent with the context of the "appropriate period" provision. Section 2705(b) is concerned with the portion of time characterized by the adverse result or results that will occur if the government's warrant or other process is disclosed. According to the latter definition above, that portion of time may be "indefinite." Thus, the ordinary meaning of the term "period" allows for indefinite Section 2705(b) NPOs.

■ Section 2705(b)'s broader context also weighs against Adobe's reading. As noted, Section 2705(a) limits the duration of a delayed-notice order to 90 days. "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Kucana v. Holder*, 558 U.S. 233, 249, 130 S.Ct. 827, 175 L.Ed.2d 694 (2010) (brackets in original; internal quotation marks omitted). Here, the Court may infer that Congress's inclu-

sion of a definite time limit in Section 2705(a), and exclusion of the same in Section 2705(b), meant that Congress did not intend to require that Section 2705(b) NPOs be of a specified duration.[4]

This interpretation is in line with another distinction between Sections 2705(a) and 2705(b). In the former provision, the government must show or certify that an adverse result "*may*" occur upon disclosure. In Section 2705(b), the government must show that the adverse result "*will*" occur. One may presume that Congress believed that the certainty, rather than possibility, of harm from disclosure weighed in favor of allowing indefinite NPOs under Section 2705(b).

Similarly, the government must make a greater showing to obtain a warrant for communications than to obtain a court order. *Compare* Fed. R. Crim. P. 41(d)(1) (requiring showing of "probable cause" for issuance of warrant) *with* 18 U.S.C. § 2703(d) (requiring showing of "specific and articulable facts" showing "reasonable grounds" to believe that communications sought are "relevant and material to an ongoing criminal investigation"). And of course, the government may propound a grand jury or trial subpoena for communications without first obtaining a court's imprimatur. With regard to communications, only those obtained by warrant may be the subject an indefinite Section 2705(b) NPO.[5] *See* discussion, *supra*. It is reasonable to conclude that Congress viewed the higher showing required for a warrant as

---

**3.** Other definitions for "period" pertain to portions of time characterized by repetition or recurrence (*e.g.*, "< = of the earth's orbit >") or historical divisions of time (*e.g.*, "< the Reformation = >"). Those definitions are clearly inapposite.

**4.** By the same token, if Congress had wished to require a finite duration for Section 2705(b) NPOs, it could have included language to that effect. *E.g.*, "[the government]

may apply to a court for [a notice-preclusion] order ... for such *finite* period as the court deems appropriate."

**5.** With respect to non-communication information, which may be obtained by means other than a warrant (*see* discussion, *supra* ), Congress may well have determined that subscribers' privacy concerns were entitled to less protection. *See In re Application of the U.S.*, 131 F.Supp.3d at 1276.

lowering the risk that an indefinite NPO might unreasonably intrude on a subscriber's privacy.

The Ninth Circuit has not ruled on whether Section 2705(b) allows for indefinite NPOs, and authority on the question is scarce. Two decisions from the Northern District of California support Adobe's reading of the statutory language. However, the Court finds them unpersuasive. In *In the Matter of the Search Warrant for [Redacted]@hotmail.com*, Magistrate Judge Paul S. Grewal in the Northern District of California reasoned that although a "period" might be indefinite "as a matter of mathematics or set theory," a more "common sense" approach suggests "some limit less than infinity." 74 F.Supp.3d 1184, 1185 (N.D. Cal. 2014). Judge Grewal repeated this analysis in *In the Matter of Grand Jury Subpoena for: [Redacted]@yahoo.com*, 79 F.Supp.3d 1091, 1093 (N.D. Cal. 2015). As discussed above, as a matter of the English language, a "period" may be indefinite. Furthermore, in this Court's view, Judge Grewal gave insufficient consideration to Congress's inclusion of a time limit in Section 2705(a) and exclusion of the same in Section 2705(b). *See In the Matter of the Search Warrant*, 74 F.Supp.3d at 1186.

At least two district courts have read Section 2705(b) to allow for indefinite NPOs. In *In re Application of the U.S. For An Order Pursuant To 18 U.S.C. § 2705(b)*, District Judge David Nuffer of the Utah District Court asserted that Section 2705(b) "deals with *precluding* notice instead of *delaying* notice. While notice from the government to the subscriber may be *delayed* for a limited time [under Section 2705(a) ], notice by the provider to the subscriber may be *indefinitely* restrained [under Section 2705(b) ]." 131 F.Supp.3d at 1270 (emphasis in original); *see id.* at 1271–72. In *Microsoft Corp. v.*

*United States Dep't of Justice*, District Judge James L. Robart of the Western District of Washington relied on Judge Nuffer's analysis in acknowledging that Section 2705(b) allows for indefinite NPOs: " 'The combined effect of [Sections 2703] and 2705(b) is that ... the government may seek an order under § 2705(b) that restrains the provider indefinitely from notifying the subscriber.' " 2017 WL 530353, at *2 (W.D. Wash. Feb. 8, 2017) (quoting *In re Application of the U.S.*, 131 F.Supp.3d at 1271)).

The holdings in *In re Application of the U.S.* and *Microsoft Corp.* do not turn on the precise question at bar in this action. Nevertheless, the Court finds their statutory interpretation instructive. Those decisions relied on the plain statutory language rather than reading an unexpressed modifier into it.

For the foregoing reasons, the Court finds that Section 2705(b) does not require a finite NPO period.

## B. The First Amendment requires a finite period for the NPO.

■■■ Adobe next contends that the NPO is a content-based prior restraint that is not narrowly-tailored to achieve a compelling government interest. As such, Adobe argues, the NPO violates the First Amendment. (Appl. at 4–5.) The government argues that (1) Adobe does not have a right under the First Amendment to notify the Subscriber of the Warrant's existence; and (2) even if Adobe did have such a right, the government's compelling interests justify the NPO as currently tailored. The Court finds that a narrower tailoring of the NPO is warranted.

### (1) The NPO implicates the First Amendment.

■■■ Citing, *inter alia, Butterworth v. Smith*, 494 U.S. 624, 110 S.Ct. 1376, 108

L.Ed.2d 572 (1990), the government contends that Adobe's "initial premise" is wrong and the First Amendment is not "implicate[d]" by the NPO. (Oppo. at 10, 13.) According to .the government, the First Amendment does not "authorize" Adobe to· share with the Subscriber information Adobe obtained by being. served with process during an ongoing grand jury investigation. (Oppo at 10, 12.) To the extent the government asserts that the notice Adobe seeks to provide the Subscriber falls outside the First Amendment's purview, the government is incorrect. As a matter of jurisprudential precision, the First Amendment is "implicated"—to use the government's term—by governmental restrictions on "pure speech" and expressive conduct. *See, e.g., Texas v. Johnson,* 491 U.S. 397, 403–04, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989) (discussing purpose of First Amendment's Free Speech Clause and contours of expressive conduct allowing persons to invoke its protection); *see also Village of Schaumburg v. Citizens for a Better Env't,* 444 U.S. 620, 628–32, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980) (discussing "speech interests" within protection of First Amendment).

Here, the government does not contend (and in fact could not contend) that notifying a subscriber of a Section 2703 warrant does not constitute speech. (*See generally* Oppo.; *see also Bartnicki v. Vopper,* 532 U.S. 514, 527, 121 S.Ct. 1753, 149 L.Ed.2d 787 (2001) (holding that federal statute prohibiting disclosure of intercepted communications was regulation of pure speech; "[i]f the acts of 'disclosing' and 'publishing' information do not constitute speech, it is hard to imagine what does fall within that category ..."). Nor do the government's authorities suggest that the NPO falls within the "historical and traditional categories" of wholly-unprotected speech, *e.g.,* fraud, incitement, and speech integral to criminal conduct. *United States v. Stevens,* 559 U.S. 460, 469, 130 S.Ct. 1577, 176

L.Ed.2d 435 (2010) (internal quotation marks omitted).

▇▇▇ Furthermore, the fact that the NPO was issued in connection · with a grand jury investigation does not make the First Amendment inapplicable. Contrary to the government's suggestion (*see* Oppo. at 11), *Butterworth* does not stand for the proposition that the government has a plenary right to restrict speech during the pre-indictment phases of a grand jury investigation. In fact, the Supreme Court explicitly stated that "grand juries are expected to operate within the limits of the First Amendment ...." *Butterworth,* 494 U.S. at 630, 110 S.Ct. 1376 (internal quotation marks omitted).

Certainly, the *Butterworth* court distinguished between information a person has before he is subpoenaed to grand jury proceedings ("pre-participation information"), and information a person learns as a result of his participation therein ("post-participation information"). *Id.* at 632, 110 S.Ct. 1376. And the Court is willing to accept *arguendo* that *vis-à-vis* Adobe, knowledge of the Warrant's existence can be characterized as post-participation information. However, it is not accurate to state, as the· government does (Oppo.. at 11), that the Supreme Court held that post-participation information deserves *no* First Amendment protection.

Rather, the Supreme Court considered whether a Florida statute violated the First Amendment to the extent it prohibited a grand jury witness from disclosing his own testimony after the grand jury's term ended. *Butterworth,* 494 U.S. at 626–36, 110 S.Ct. 1376. The Supreme Court (1) weighed the competing interests surrounding the disclosure of pre-participation information; and (2) found that the interests favoring suppression lessened greatly once the grand jury proceedings concluded. This holding does not require the Court to forego a First Amendment analysis simply

because Adobe learned of the investigation *via* the Warrant.

Finally, the question is not whether the First Amendment "authorizes" a person to speak on a particular topic (Oppo. at 11), but whether the challenged governmental restrictions unduly intrude on the *a priori* right to speak. *See, e.g., Village of Schaumburg*, 444 U.S. at 633, 100 S.Ct. 826. Accordingly, the government's assertion that the First Amendment is not at issue is unavailing.

### (2) The NPO is a prior restraint and a content-based restriction.

▮▮▮▮ As relevant, "[t]he term prior restraint is used to describe administrative and judicial orders forbidding certain communications when issued in advance of the time that such communications are to occur." *Alexander v. United States*, 509 U.S. 544, 550, 113 S.Ct. 2766, 125 L.Ed.2d 441 (1993) (internal quotation marks omitted; emphasis omitted). "Temporary restraining orders and permanent injunctions— *i.e.*, court orders that actually forbid speech activities—are classic examples of prior restraints." *Id.* (internal quotation marks omitted). While prior restraints "are not unconstitutional *per se*[,] . . . [a]ny system of prior restraint . . . comes to this Court bearing a heavy presumption against its constitutional validity." *South-eastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 558, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975). "Prior restraints are subject to strict scrutiny because of the peculiar dangers presented by such restraints." *Levine v. United States Dist. Court for Cent. Dist. of California*, 764 F.2d 590, 595 (9th Cir. 1985).

▮▮▮▮ Content-based restrictions on speech are also "presumptively unconstitutional." *Reed v. Town of Gilbert, Ariz.,* —— U.S. ——, 135 S.Ct. 2218, 2227, 192 L.Ed.2d 236 (2015). "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Id.* As with prior restraints, content-based restrictions are subject to strict scrutiny. *Reed*, 135 S.Ct. at 2231; *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 813, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000).

Courts considering the issue have almost uniformly found that Section 2705(b) NPOs, or NPOs issued under analogous statutes, are prior restraints and/or content-based restrictions. *See In re Sealing & Non–Disclosure of Pen/Trap/2703(d) Orders*, 562 F.Supp.2d 876, 881–83 (D. Tex. 2008) (holding that "gag orders" issued under Section 2705(b) and 18 U.S.C. § 3123(d)(2) constitute prior restraints and content-based restrictions); *Matter of Grand Jury Subpoena*, 79 F.Supp.3d at 1091 (asserting that indefinite Section 2705(b) would amount to "undue prior restraint of Yahoo!'s First Amendment right to inform the public of its role in searching and seizing its information"); *Microsoft Corp.*, 2017 WL 530353, at *11–*12 (holding that plaintiff adequately alleged that indefinite Section 2705(b) NPOs were impermissible prior restraints and content-based restrictions); *In re Application of the United States of Am. for Nondisclosure Order Pursuant to 18 U.S.C. § 2705(b) for Grand Jury Subpoena # GJ2014032122836*, 2014 WL 1775601, at *2 (D.D.C. Mar. 31, 2014) (holding that Section 2705(b) "gag order" for "certain period of time" would constitute prior restraint and content-based restriction); *but see John Doe, Inc. v. Mukasey*, 549 F.3d 861, 876 (2d Cir. 2008), *as modified* (Mar. 26, 2009) (noting that analogous provision in 18 U.S.C. § 2709 is not "typical example" of prior restraint).

Notwithstanding the weight of authority, the government argues that the NPO is not a prior restraint, because it is more akin to a protective order limiting the dis-

closure of information learned in pretrial discovery or in connection with grand jury proceedings. (Oppo. at 11 (citing, *inter alia, Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984)).) The government's authorities are distinguishable. In *Seattle Times*, the Supreme Court emphasized that "[a] litigant has no First Amendment right of access to information *made available only for purposes of trying his suit.*" 467 U.S. at 32, 104 S.Ct. 2199 (emphasis added). That is, the litigant's First Amendment rights do not include "the unrestrained right to gather information." *Id.* (internal quotation marks omitted). Here, Adobe did not "gather" the information in question from the government, with the aim of advancing Adobe's interests in a lawsuit. Therefore, the NPO is not on par with protective orders directed to litigants in civil suits. Furthermore, as discussed, the Supreme Court emphasized in *Butterworth* that grand jury proceedings must still operate within the First Amendment's confines. The government's out-of-circuit authorities regarding grand jury proceedings do not persuade the Court that the NPO is not a prior restraint.

The government further argues that the NPO is not a content-based restriction, because it does not "completely preclude Adobe's speech." (Oppo. at 14.) Rather, the government asserts, Adobe may reveal the kind of general information which Adobe publishes in its transparency reports. (*Id.*) The government further argues that the NPO is not a "forever ban," because it is subject to challenge by Adobe and may be lifted in the future. (*Id.*) For these reasons, the government suggests, the NPO is merely a content-neutral restriction on the time, place, and/or manner of speech. As such, it is subject to a lesser standard of scrutiny. (*Id.* at 13, 125 S.Ct. 377.)

■ These arguments are not persuasive. In deciding whether a restriction is content-based rather than content-neutral, courts do not examine whether it "completely preclude[s]" speech or amounts to a "forever ban." Rather, a law is content-based "if the main purpose in enacting it was to suppress or exalt speech of a certain content, or it differentiates based on the content of speech on its face." *Long Beach Area Peace Network v. City of Long Beach*, 574 F.3d 1011, 1024 (9th Cir. 2009) (internal quotation marks omitted); *see also Consol. Edison Co. of N.Y. v. Public Serv. Comm'n of N.Y.*, 447 U.S. 530, 537, 100 S.Ct. 2326, 65 L.Ed.2d 319 (1980) (restriction is content-based if it "prohibit[s] [ ] public discussion of an entire *topic*" (emphasis added)).

■ A court must "consider[ ] whether a law is content neutral on its face before turning to the law's justification or purpose." *Reed*, 135 S.Ct. at 2228. In that regard, the court determines whether it "draws distinctions based on the message a speaker conveys." *Id.* at 2227. Here, the government contends that the NPO allows speech on certain subject matters (*e.g.*, general information such as Adobe's receipt of *a* warrant), but not others (*e.g.*, Adobe's receipt of the Warrant itself). Therefore, by the government's own parsing, the NPO is facially content-based.

Moreover, as discussed above, in order to obtain the NPO, the government was required to show that disclosure of the Warrant's existence would have certain undesirable effects. Therefore, the NPO's justification was based on the content of the speech it is intended to regulate, further demonstrating that the NPO is content-based. *See Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) ("Government regulation of expressive activity is content neutral so long as it is *justified* without reference to the content of the regulated speech" (emphasis in original; internal quotation marks omitted)).

For the foregoing reasons, the Court concludes that the NPO is a content-based prior restriction subject to strict scrutiny.

### (3) The NPO does not survive strict scrutiny.

■■■■■ Strict scrutiny "requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed*, 135 S.Ct. at 2231 (internal quotation marks omitted). "The purpose of the [strict scrutiny] test is to ensure that speech is restricted no further than necessary to achieve the goal, for it is important to ensure that legitimate speech is not chilled or punished." *Ashcroft v. American Civil Liberties Union*, 542 U.S. 656, 666, 124 S.Ct. 2783, 159 L.Ed.2d 690 (2004). Thus, "[i]f a less restrictive alternative would serve the Government's purpose," that alternative must be used. *Playboy*, 529 U.S. at 813, 120 S.Ct. 1878. Furthermore, "[w]hen a plausible, less restrictive alternative is offered to a content-based speech restriction, it is the Government's obligation to prove that the alternative will be ineffective to achieve its goals." *Id.* at 816, 120 S.Ct. 1878.

■■■■ Here, Adobe concedes that the government has an interest in protecting its investigation. (Appl. at 4; Reply at 4.) Adobe argues, however, that the NPO is not narrowly-tailored to serve that interest, because the NPO's indefinite term "means that its temporal scope is not tailored at all, let alone narrowly." (Appl. at 4.)

The government contends that the NPO's indefinite term is "'presumptively justified'" during the investigation period. (Oppo. at 15 (quoting *In re Sealing*, 562 F.Supp.2d at 895).) This presumption applies because during the early stages of an investigation, the government cannot perfectly predict the investigation's future course and future threats. (Oppo. at 16.) "'[N]arrowly tailored,'" the government argues, does not equal "'perfectly tailored.'" (*Id.* (quoting *Williams–Yulee v. Florida Bar*, —— U.S. ——, 135 S.Ct. 1656, 1671, 191 L.Ed.2d 570 (2015)).)

That the NPO furthers the government's interest in protecting its investigation is well-taken. And the Court will accept *arguendo* that the government cannot state with certainty an end date for the threat Adobe's speech would pose thereto. However, the government's arguments do not address the core issue in strict scrutiny review: "whether the challenged regulation is the *least restrictive means* among available, effective alternatives." *Ashcroft*, 542 U.S. at 666, 124 S.Ct. 2783 (emphasis added). As written, the NPO at issue herein effectively bars Adobe's speech in perpetuity. The government does *not* contend, and has made no showing, that Adobe's speech will threaten the investigation *in perpetuity*. Therefore, as written, the NPO manifestly goes further than necessary to protect the government's interest.

Furthermore, there are effective and less restrictive alternatives available. For example, the Court could set a date certain for the NPO—*e.g.*, 180 days. *See In re Sealing*, 562 F.Supp.2d at 895 (asserting that 180-day period for pen/trap sealing and nondisclosure orders is "short enough to respect the fundamental values at stake, and long enough not to cause an undue burden"). Under Section 2705(b), the government could obtain an extension of that period upon making the required showing. Nothing in the record indicates that this alternative would be "ineffective" in achieving the government's goals. The government has made only general representations regarding how long this investigation might take, and it has provided no facts indicating that the inconvenience of reapplying for an NPO, if that were necessary, would unduly strain its resources.

The government disagrees with a date-limited NPO on a theoretical level. Such an NPO may be "under-inclusive (too short) or overinclusive (too long)." (Oppo. at 17.) The government is technically correct. However, the relevant points are that (1) a date-limited NPO will be unquestionably less restrictive than an indefinite one; and (2) the government has not met its burden of showing that a reasonable time limit will be ineffective in protecting its interests. Accordingly, on the particulars herein, the imprecision of a date limit does not counsel in favor of keeping the NPO as written.

The government further argues that the NPO is already limited by the Court's discretion to set an end at some later date. As this "judicial[ ] limit[ ]" allows "both Adobe and the government to apply for the order to be lifted after its *raison d'etre* fades, the NPO is as narrowly-tailored as required." (Oppo. at 17.) This argument ignores the fact that Adobe is not privy to the government's investigation. Thus, Adobe will not know when the NPO's "*raison d'etre* fades." Moreover, virtually every statute, regulation, order, or other government-imposed restriction on speech can be attacked in a judicial proceeding. Therefore, the government's argument—in essence, "The order is narrowly-tailored because Adobe has the option of challenging it in court"—demonstrates nothing of relevance.

In any event, putting the onus on the speaker to lift a no-longer-justified content-based restriction is hardly narrow tailoring. Adding the fact that the speaker cannot know when the restriction's "*raison d'etre* fades" effectively equates to no tailoring at all. An RCS provider might decide to forego speaking rather than incur the trouble and expense of potentially futile court trips. That the government could in theory, apply to have the NPO lifted is no answer. As the NPO does not apply to the government, the government would have little incentive to do so.[6] Accordingly, on the record before the Court, the government's argument does little more than illustrate the NPO's potential for burdening or chilling Adobe's speech.

Finally, the government argues that the NPO is narrowly-tailored because (1) it is limited to facts about "this particular ... investigative process"; and (2) the government was required to make a "precise showing" that notification would result in certain harms. (Oppo. at 15.) These points fall wide of the mark. Adobe challenges the NPO's duration, not the breadth of facts covered. Furthermore, as discussed above, the government has not made a "precise showing" that the harms will occur in perpetuity.

For the foregoing reasons, the Court finds that the First Amendment requires that it modify the NPO to include a set expiration date. The Court sets that expiration date at 180 days from the date of this order. In so holding, the Court does not rule that the First Amendment would be violated by every indefinite NPO issued under Section 2705(b). Rather, the Court bases its holding on the record in this particular case.

## C. The Court partially grants Adobe's request to unseal the parties' filings.

 Finally, Adobe requests that the Court unseal the parties' filings and the Court's order thereon. (Appl. at 5–6.)

6. Nor would it serve to order the government to notify the Court when the investigation is over. The Court is not privy to the details of the investigation and thus would have no way of assessing the government's compliance. And as Adobe argues (Suppl. Reply at 1), an order limiting the NPO to such time as the government notified the Court that "nondisclosure [was] no longer required" (Oppo. at 9 n.4) would improperly vest discretion over the NPO's duration in the government.

Adobe appears to ground this request in its First Amendment right to speak and the public's First Amendment right of access to the courts. (*Id.*) The government counters that the public does not have a right of access to search warrant proceedings and related documents while a pre-indictment investigation is ongoing. (Oppo. at 17–18 (citing, *inter alia, Times Mirror Co. v. United States*, 873 F.2d 1210, 1218–21 (9th Cir. 1989)).)

Neither party is quite on point. Adobe's reliance on its speech rights is inapposite. *In re Sealing*, 562 F.Supp.2d at 887 ("The sealing of judicial records imposes a limit on public access rather than a direct restriction on speech"). Furthermore, (1) Adobe does not seek the disclosure of the Warrant or its supporting materials; and (2) the parties' briefs do not refer to particulars of the Warrant or the investigation. Accordingly, *Times Mirror* is not controlling. Moreover, the government does not object to this Court's issuance of an unsealed ruling on the Application. As the parties' briefs are scarcely more detailed than the Court's ruling, the government's objections to unsealing them are not well-taken.

The Court therefore concludes that it would be appropriate to unseal the parties' briefs and to file the instant order in the public record. The Court will delay the foregoing actions until 20 days from the date of this order, to allow to government to apprise the Court of any concerns it has with respect to the actions contemplated by the Court.

The Court also concludes that each side's declarations and exhibits must remain under seal. Given that the government filed its brief, declaration, and exhibits as a single document, the Court directs the government to file a copy of its brief without the declaration and exhibits prior to the expiration of 20–day period described above. The government may make any redaction of its brief that it deems appropriate.

## III. CONCLUSION

For the foregoing reasons, the Court orders the following

(1) The Warrant's NPO is amended. Adobe is ordered not to notify any person, including the Subscriber, of the existence of the Warrant, for 180 days from the date of this order. The government may obtain an extension of the NPO as discussed herein.

(2) This order, the Application, Opposition (without the attached declaration and exhibits), Reply, and Supplemental Reply shall be unsealed 20 days from the entry of this order. The government must file a copy of the Opposition *sans* declaration and exhibits prior to the end of that 20–day period. The government may seek review of this order as provided in the Local Rules and/or notify the Court of additional concerns the unsealing order may raise.